NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2016 VT 74

No. 2015-218

| | |
|---|---|
| Sharon Conant | Supreme Court |
| | |
| | On Appeal from |
| v. | Commissioner, Department of Labor |
| | |
| Entergy Corporation | September Term, 2015 |

Anne M. Noonan, Commissioner

Cristina Rousseau of Van Dorn & Curtiss, PLLC, Orford, New Hampshire, for
  Plaintiff-Appellee.

Wesley M. Lawrence and Keith Aten of Theriault & Joslin, P.C., Montpelier, for
  Defendant-Appellant.

PRESENT: Reiber, C.J., Dooley, Skoglund, Robinson and Eaton, JJ.

¶ 1.    **EATON, J.**  Employer Entergy Corporation challenges the denial of its request for a credit against future workers' compensation benefits owed to claimant Sharon Conant. Employer asserts that, given the payments it made to claimant under the terms of a collective bargaining agreement, as well as the retroactive temporary total disability (TTD) payments it was ordered to make, claimant has received more money as wage replacement than she was owed. We agree. We therefore reverse the Commissioner of the Department of Labor's decision on this point, and remand for a determination of the amount to be offset from claimant's future workers' compensation benefits.

¶ 2.    The material facts are undisputed. In early February 2014, claimant injured her ankle in employer's parking lot. She reported her injury to employer, who, in turn, submitted an

injury report to its workers' compensation insurer, AIG. Under its compensation policy with AIG, employer must reimburse AIG for all workers' compensation benefits paid, with a limit of $1,000,000 per claim. Employer is thus essentially self-insured for virtually all compensation claims; the primary benefit of its policy is the administration and defense of claims.

¶ 3. Claimant here had access to two forms of payment following her injury. Under the Workers' Compensation Act (Act), when an employee is injured on the job and becomes unable to work, an employer must pay "a weekly compensation equal to two-thirds of the employee's average weekly wages, but not more than the maximum nor less than the minimum weekly compensation." 21 V.S.A. § 642 (also providing that injured employee is entitled to $10 per week for each dependent child who is unmarried and under age twenty-one); see also id. § 618(a)(1) (stating that compensation is due when worker "receives a personal injury by accident arising out of and in the course of employment"). The statute provides that "in no event shall an employee's total weekly wage replacement benefits, including any payments for a dependent child, exceed 90 percent of the employee's average weekly wage prior to applying any applicable cost of living adjustment." 21 V.S.A. § 642.

¶ 4. Employer and claimant were also subject to the terms of a collective bargaining agreement (CBA). The CBA provided compensation in differing amounts for occupational and nonoccupational disabilities. An occupational disability is defined as "a physical or mental handicap" that "occurred while the employee was doing his/her job and prevents the employee from performing his/her job." The CBA specifically provides for an offset for workers' compensation benefits for occupational disabilities. It states:

> Subject to completion of Workers' Compensation forms and procedures, normal wages will be paid to the employee for the first work week of an occupational disability.
>
> After the first week of occupational injury has been paid, subject to the approval of the employee's department Supervisor/Manager and the Human Resources Department, full normal wages will be paid:

- less Workers' Compensation benefits.
- for whichever occurs first:

    i.    a period equaling two weeks for each completed year of continuous service dating from the employee's original employment by either the Company or a present or former affiliated company; or

    ii.   for the length of the occupational disability.

- Workers' Compensation benefits will be paid after the period described above.

¶ 5.    The CBA defines a nonoccupational disability as "a physical or mental handicap that does not occur on the job and is for longer than five (5) consecutive days and prevents the employee from performing his/her job."  The CBA provided three stages of benefits for non-occupational disabilities: (1) continued full salary for five days or until accrued "continuance of full salary days" are exhausted, whichever is longer, followed by (2) a short-term disability benefit equal to 60 percent of the employee's weekly salary for up to twelve months, and then (3) a long-term disability benefit.

¶ 6.    The CBA makes plain the parties' intent that payments for occupational injuries are offset by workers' compensation payments.  See In re Grievance of VSEA, 2014 VT 56, ¶ 23, 196 Vt. 557, 99 A.3d 1025 ("Our goal in construing a contract is to determine the intention of the parties and implement it.").  The CBA is also very clear concerning its overall application.  A worker injured on the job will receive, subject to the terms of the Act and the CBA, 100% of his or her wages through a combination of benefits from both sources.  Workers' compensation provides 66.66% in wage replacement pursuant to 21 V.S.A. § 642, and the CBA provides additional wage replacement to bring the injured worker to 100% of his or her wages.  In other words, the CBA fills the gap in wage replacement benefits that would ordinarily exist between a worker's average weekly wages and the TTD payments under the Act, which are 66.66% of average weekly wages.  For workers injured in nonoccupational incidents, the CBA provides 60% wage replacement, while there will be no wage replacement under the Act.

3

¶ 7. Because AIG denied claimant's request for workers' compensation benefits, employer began paying claimant salary continuance and short-term disability benefits pursuant to the nonoccupational disability provision in the CBA. Employer ultimately paid claimant $24,927.75 in accrued continuance of full salary days and short-term disability benefits under the CBA covering the pay periods from March 9, 2014 through August 23, 2014. Unlike workers' compensation benefits, these payments were subject to taxes. After taxes and other deductions, claimant received a net payout of $14,524.16.

¶ 8. Meanwhile, in June 2014, claimant requested a hearing on the denial of her claim for workers' compensation benefits, arguing that this was an occupational (work-related) rather than a nonoccupational injury. A Department of Labor (DOL) workers' compensation specialist found the denial of workers' compensation benefits not reasonably supported and issued an interim order directing employer/AIG to pay claimant TTD benefits retroactive to March 7, 2014, the date on which claimant began losing time from work as a consequence of her injury. See Wood v. Fletcher Allen Health Care, 169 Vt. 419, 423, 739 A.2d 1201, 1205 (1999) (explaining that TTD benefits are awarded "during the worker's recuperation period until the worker is restored as much as possible to functionality," and such "benefits are provided as a partial substitute for wages lost during the recuperation period"). The interim order indicated that, pursuant to statute, the failure to pay as directed within twenty-one days could result in additional amounts and/or interest owed to claimant, as well as administrative penalties.

¶ 9. Employer immediately sought a stay of this order pending a determination of whether it actually owed any TTD payments given the short-term disability benefits that claimant had already received to replace lost earnings during the period in question. While the stay request was pending and as the twenty-first day approached, employer/AIG paid claimant $34,980, which represented thirty weeks of retroactive TTD benefits dating back to March 7, 2014, at a weekly compensation rate of $1166. The DOL specialist then denied the stay request as moot. As a result,

4

claimant received more in combined compensation and CBA wage replacement benefits than she would have received had the injury been deemed either occupational or non-occupational from the outset.

¶ 10.    Employer subsequently moved for summary judgment on the overpayment issue. With one exception, the Commissioner denied its request.  The Commissioner recognized that the Act evinced a strong policy against double recovery.  She found that 21 V.S.A. §§ 651 and 693, read together, prohibit a claimant from being paid twice for the same benefit—once from the employer and once from its insurance carrier.  Thus, she stated, if a claimant has already received a wage replacement benefit from one entity and subsequently receives payment of the same benefit from the other, the latter payment becomes under § 651, one "which, by the provisions of this chapter, [was] not due and payable when made," and thereby subject to an offset, in the Commissioner's discretion, against any benefits still owed.  Nonetheless, while 21 V.S.A. § 651 clearly allowed for an offset in situations where a claimant receives payments that ultimately are deemed not to have been owed, the statute made no provision for reimbursement.  Given this, the Commissioner concluded that reimbursement was not an available remedy.  It is worth noting that the only reason that this became a question of reimbursement as opposed to an offset was due to the lack of a timely ruling on employer's motion to stay.

¶ 11.    In any event, citing Yustin v. Department of Public Safety, the Commissioner allowed employer/AIG to offset any TTD benefits that it paid for weeks during which claimant also received payment from employer for her accrued continuance of full salary days.  2011 VT 20, 189 Vt. 618, 19 A.3d 611 (mem.).  These payments were made to claimant under the nonoccupational injury provision of the CBA.  This offset applied against any future workers' compensation indemnity payments.

¶ 12.    The Commissioner was unwilling, however, to extend the offset to include the short-term disability benefits that employer paid.  She based this decision on the fact that the CBA

5

excused employer from making any wage or salary payments, for either occupational or nonoccupational disabilities, in cases where the employee's disability resulted from a safety violation about which an employee had been warned, or when the employee was working concurrently for another employer. While neither contingency was asserted to have any relevance to claimant's injury, the Commissioner determined that these contingencies raised issues foreign to the workers' compensation scheme. "When they arise," the Commissioner stated, "these issues are best resolved in the context of the agreement's grievance and dispute resolution system, not in the context of a workers' compensation proceeding." How the threat of these "foreign contingencies" has any bearing on the issues between the employer and employee concerning this claim was not explained. Similarly unexplained was why this rationale did not extend to the accrued continuance of full salary days to which these "contingencies" likewise applied.

¶ 13. The Commissioner's decision regarding the short-term disability benefits is erroneous. See Wood, 169 Vt. at 422, 739 A.2d at 1204 ("The Commissioner's decision is presumed valid, to be overturned only if there is a clear showing to the contrary."). The Commissioner allowed for some offset of the benefits paid under the CBA, but disallowed others because of "contingencies" in the CBA that have no relevance here. There is no dispute that employer paid claimant short-term disability benefits under the CBA, and that the contingencies did not arise. Through these payments and the TTD payments, claimant received two forms of wage replacement from her employer for the same injury, resulting in receipt of wage replacement greater than 100% of her wages. In other words, claimant received more in wage replacement by not working than she would have had she either not been injured at all and continued to work, or if her injury was clearly work-related from the outset. This result is inconsistent with Yustin, the workers' compensation laws, and public policy.

¶ 14. In Yustin, we held that an employer could offset the sick wages that it paid to a claimant during a period of temporary total disability against workers' compensation benefits that

6

it was ordered to pay for the same period. 2011 VT 20, ¶ 5. Our decision rested on the "clear and strong policy against the double recovery of benefits" underlying the Act. Id. ¶ 7. We found it immaterial that Vermont law did not contain an express provision allowing for a set-off of the benefits in question. We recognized that statutory setoffs "serve the salutary purpose of encouraging continued payment to the employee for the period of time that his or her claim is being considered while preventing a double recovery in the event that the claim is ultimately allowed." Id. ¶ 8 (citing cases). Even without a statutory set-off clause, however, we found nothing in the Act that would "compel employers to pay twice for the same lost time due to work injury or prohibit a credit for payments made by employers for what are later deemed compensable injuries." Id. ¶ 11.

¶ 15. As we made clear in Yustin, an employer complies with the Act when a claimant "receive[s] full and direct payment of wage replacement from the employer during the disability period." Id. ¶ 10. "The workers' compensation statute bothers not over what account the money comes from, so long as it comes from the employer." Id. We emphasized that the attempt to acquire two payments from an employer for the same injury runs contrary to established policy against double recovery and would have the employer do more than what the statute demands. Id. Thus, we concluded that the employer's decision to reimburse the claimant's sick leave "did not violate the statute or deprive [the] claimant of any workers' compensation benefits due." Id. ¶ 5.

¶ 16. As in Yustin, employer here provided all of the payments made to claimant: short-term disability benefits under the CBA out of one pocket and workers' compensation benefits out of the other.[1] Claimant has thus recovered twice from employer for the same period of injury. By refusing to allow an offset, the Commissioner required employer to pay more than claimant's

---

[1] The employer and its insurer are the same for workers' compensation purposes. See 21 V.S.A. § 601(3) (defining term "employer," and stating that if employer is insured, term "includes the employer's insurer so far as applicable"). Whether employer was "self-insured" or not is beside the point. Under Yustin and 21 V.S.A. § 601(3), both of the payments in question here are coming from employer's pocket.

7

weekly salary and prohibited employer from obtaining a credit for overpayments made for what was later deemed a compensable injury. This directly contravenes our holding in Yustin and the strong policy against double recovery found in the Act. Id. ¶¶ 7, 11.

¶ 17. Vermont's Workers' Compensation Act clearly provides for an offset in this situation. 21 V.S.A. § 651 provides:

> Payments made by an employer or his or her insurer to an injured worker during the period of his or her disability, or to his or her dependents, which, by the provisions of this chapter, were not due and payable when made, may, subject to the approval of the commissioner, be deducted from the amount to be paid as compensation.

Employer, through the CBA, initially paid claimant non-occupational disability benefits under the CBA, which, standing alone, are higher than the amount payable under the CBA as the result of an occupational injury. Thus, the Commissioner's determination that the injury was work-related means the amount actually due under the CBA was the difference between the 60% received under the CBA and the 33.33% actually due (with a tax adjustment). The order, issued under the provisions of the compensation chapter, means that portion of the CBA benefits paid above 33.33% were not actually due and payable when made because the injury was, in actuality, occupational.

¶ 18. It was claimant who sought to classify her injury as an occupational one, as was her right. In light of the compensation specialist's order that the injury was compensable, claimant had received payments under the wrong provision in the CBA, and the payments received were not in fact "due and payable when made" under 21 V.S.A. § 651 to the extent they exceeded weekly wages. If there was no question the injury was occupational the employer would have paid 33.33% under the CBA from the outset. As claimant received workers' compensation benefits, this clearly became an occupational disability under the CBA, by virtue of the Commissioner's order, not a nonoccupational one, and a setoff is required. Claimant cannot have it both ways with an occupational injury for worker's compensation purposes and a nonocupational one for purposes of

8

the CBA. This would place claimant in a more favorable position than someone who sustained a clearly work-related injury.

¶ 19. Certainly it was to claimant's benefit that upon the initial denial of her request for workers' compensation benefits, employer immediately began paying her benefits under the nonoccupational disability provision in the CBA. That does not mean, however, that this error cannot be remedied or that employer is somehow obligated to pay claimant more than her actual wages for the period in which she was injured by deciding to contest the compensability of the claim. "It is not a purpose of the Workers' Compensation Act to allow an employee to profit through the receipt of double benefits." Matter of Houda v. Niagara Frontier Hockey, 16 A.D.3d 926, 928 (N.Y. App. Div. 2005). If claimant's initial workers' compensation claim had been accepted, there would be no question what the short-term disability payment under the CBA would have been, resulting in less payments to the claimant under the CBA than she actually received.

¶ 20. Any other conclusion would contravene public policy. An employee hurt on the job cannot receive wage replacement constituting more than 100% of her weekly wages absent a contractual agreement that expressly so provides. As one court has explained:

> If, after having received full wages during the period of his disability, petitioner were permitted to recover, in addition, the amount of the disability payments to which he was entitled, he would be given double payment for a single injury. Under such circumstances, an incapacitated employee performing no services would receive a larger payment than one rendering services. To interpret the statute as permitting such double recovery would not be reasonable. . . . [U]nder the Workmen's Compensation Laws an injured employee should not receive, in an ordinary case, greater compensation than his wages would have been had he not been injured.

Herrera v. Workmen's Comp. Appeals Bd., 455 P.2d 425, 428 (Cal. 1969) (citation omitted).

¶ 21. Other courts have reached similar conclusions. In Freel v. Foster Forbes Glass Co., 449 N.E.2d 1148 (Ind. Ct. App. 1983), a case we cited in Yustin, the court considered an argument very similar to that presented here: whether an employer could offset the amount of TTD benefits

9

owed against payments made during the same period pursuant to a wage-continuation plan. Under the wage-continuation plan, the employer guaranteed that certain employees would receive their full wages if they were unable to work due to any illness or accident. The plan applied to both occupational and nonoccupational illnesses and accidents, but it was silent regarding the relationship of the wage-continuation benefits to workers' compensation benefits.

¶ 22. The claimant in Freel was injured on the job and unable to work, and in accordance with its wage continuation plan, the employer continued to pay the claimant his regular wages. The employer made no actual TTD payments. The claimant sought workers' compensation benefits, but died during the pendency of the proceedings. A hearing officer determined that the claimant's dependents were entitled to $6682 in TTD benefits. The employer was credited with the $15,213.04 it had paid as wage-continuation payments, and thus, the claimant's dependents recovered nothing further from the employer.

¶ 23. The claimant's dependents appealed, arguing that the state labor board had no jurisdiction to modify the wage-continuation contract to provide that its benefits were reduced by the amount of TTD payments. The court rejected this characterization of the decision below. It found that the issue before the board was not the amount of wage continuation payments owing under the contract, but rather, the amount of TTD benefits owing to the claimant. The employer had paid the wage continuation benefit in full as promised, and the effect of those payments on the employer's duty to pay TTD was properly before the board based on a statute that provided: "Any payments made by the employer to the injured employee during the period of his disability . . . which . . . were not due and payable when made, may, subject to the approval of the industrial board, be deducted from the amount to be paid as compensation." Id. at 1151 (citation omitted). The court found that, contrary to the claimant's argument, the fact that wage continuation payments were due and payable under the contract did not mean that no deduction could be made

10

under the statute. As long as the payments were not due and payable, the board had the discretion to deduct them from the employer's liability.

¶ 24. In reaching its decision, the court noted the purpose of the Workers' Compensation Act, and the "strong policy against double recovery." Id. It emphasized that:

> If [the employer] is not given credit for its earlier wage continuation payments, [the claimant] not only will recover twice for the same injury, but will receive from the employer more money for the period of disability than could have been earned if there had been no injury. We do not believe that such a result is consistent with the purposes of the act.

Id.; see also United Toolcraft, Inc. v. Sousley, 147 N.E.2d 558 (Ind. App. 1958) (holding that where employer paid benefits under group disability policy to employee under mistaken belief that his condition resulted from illness rather than injury arising out of and in course of employment, employee's acceptance of such benefits did not bar him from benefits to which he was entitled under workers' compensation law, and employer was properly allowed credit for payments made under disability policy). These same considerations drove our decision in Yustin, and they compel reversal of the Commissioner's decision here.

¶ 25. When the correct CBA provision is applied, it can be determined exactly how much money has been overpaid through the combination of benefits. It is no defense here that claimant may have received an overpayment of short-term-disability payments under the CBA rather than an overpayment of workers' compensation benefits. Because both payments came from employer, employer is entitled to credit the overpayment against future compensation benefits that would otherwise be due pursuant to § 651. While we agree with the Commissioner that § 651 does not provide for reimbursement, it does provide for an offset when the payments were not due and payable when received, as was the case with some of the CBA payments here. The combination of wage replacement benefits received by the claimant is too high, caused solely by the employer dutifully paying the higher nonoccupational disability benefits under the CBA while the

11

compensation claim was denied and paying full temporary benefits to the claimant by Commissioner's order once the injury was determined to be work-related.

¶ 26. Employer does not need to resort to the grievance process to resolve this question. The "overpayment" here resulted solely from the Commissioner's order. It is for the Commissioner to determine if claimant has been paid twice for the same benefit—once from the employer and once from its insurance carrier—as well as the extent to which such payments were "not due and payable when made," and thereby subject to an offset. 21 V.S.A. § 651. The Commissioner here allowed a limited offset but found that she was not empowered to make an additional offset. This was error. Employer here did everything that it could to bring the issue of the potential overpayment to the Commissioner's attention before it made its TTD payments. Employer should not suffer the consequences of a Hobson's choice by virtue of the Commissioner failing to make a timely ruling on employer's request for a stay.

¶ 27. We made clear in Yustin that an employer complies with the Act when a claimant "receive[s] full and direct payment of wage replacement from the employer during the disability period." 2011 VT 20, ¶ 10. That requirement was satisfied here, and neither the Act nor the CBA provides any grounds for obligating employer to pay more. The Commissioner's decision must be reversed to allow employer the offset to which it is entitled.

Reversed and remanded for a determination of the amount of offset that employer is entitled to receive pursuant to 21 V.S.A. § 651 by virtue of the overpayment of wage replacement resulting from the Commissioner's determination that the injury was occupational in nature.

FOR THE COURT:

_____
Associate Justice

¶ 28. **ROBINSON, J., dissenting.** In deciding that policy concerns support the credit sought by employer in this case, the majority disregards the terms and structure of the workers'

compensation statute, extends the authority of the Commissioner of the Department of Labor to matters well outside of the purview of the workers' compensation laws, disrupts existing contractual agreements and the ability of employers and disability insurers to enter into contracts for nonoccupational disability coverage, and creates unintended complexities in the calculation of workers' compensation benefits. This Court's analysis in Yustin v. Department of Safety, 2011 VT 20, 189 Vt. 618, 19 A.3d 611 (mem.), problematic for some of the same reasons, should not be extended so far beyond the specific circumstances that supported the Court's analysis in that case.

¶ 29. I note at the outset this Court's standard of review of the Commissioner's interpretation of workers' compensation statutes. "While we review questions of law de novo, because 'the Commissioner has been entrusted by the Legislature with the administration of the workers' compensation program, we owe substantial deference to her initial interpretation and application' of the workers' compensation statutes." Cyr v. McDermott's, Inc., 2010 VT 19, ¶ 14, 187 Vt. 392, 996 A.2d 709 (quoting Letourneau v. A.N. Deringer/Wausau Ins. Co., 2008 VT 106, ¶ 8, 184 Vt. 422, 966 A.2d 133). "The Commissioner's decision is presumed valid, to be overturned only if there is a clear showing to the contrary." Wood v. Fletcher Allen Health Care, 169 Vt. 419, 422, 739 A.2d 1201, 1204 (1999); see In re Chatham Woods Holdings, LLC, 2008 VT 70, ¶ 6, 184 Vt. 163, 955 A.2d 1183 (emphasizing deference due to Commissioner as to both findings of fact and interpretations of governing statutes and regulations). For the reasons set forth below, under this standard, the Commissioner's interpretation of the statute was wholly reasonable and entitled to deference.

I. The Workers' Compensation Statute

¶ 30. I begin with the workers' compensation statute, which must be enforced according to its terms. See Gintof v. Husky Injection Molding, 2005 VT 8, ¶ 8, 177 Vt. 638, 868 A.2d 713 (mem.) (explaining that neither this Court nor Commissioner has "ability to expand" rights and

benefits provided in statute). In interpreting the workers' compensation statute, we look first to the plain meaning of the words used by the Legislature. Morin v. Essex Optical/The Hartford, 2005 VT 15, ¶ 7, 178 Vt. 29, 868 A.2d 729. Because of the law's remedial nature, "we construe it liberally to allow benefits unless the law is clear to the contrary." Id. (quotation omitted).

¶ 31. The workers' compensation statutes include several provisions relating to repayment of, or a credit against, future workers' compensation benefits, none of which support the majority's position in this case. One type of provision provides that when an employer has advanced payments voluntarily or pursuant to the Commissioner's order, the Commissioner may order repayment of workers' compensation benefits paid by the employer, or may assess a future credit in favor of the employer against the employee's future worker's compensation benefits. In particular, when the Commissioner orders the payment of interim benefits after an employer's denial, but then ultimately determines that the employee is not entitled to the benefits, the Commissioner may order the employee to repay the benefits to which the employee ultimately was not entitled. 21 V.S.A. § 662(b). The statute specifically provides that this order is enforceable in court. Id.

¶ 32. Similarly, under 21 V.S.A. § 643a, when an employee challenges an employer's discontinuance of weekly temporary total or temporary partial disability benefits, the employee may seek an extension of benefits for fourteen days. The statute provides that the employer's payments during this period are without prejudice, and may be deducted from amounts due for permanent partial disability benefits if the Commissioner determines that the discontinuance is warranted or if the Commissioner otherwise orders a deduction. Id. That same statute further empowers the Commissioner to order an employer to continue paying temporary disability benefits after an employer's notice of discontinuance until a final hearing. Id. If the Commissioner subsequently concludes that the employee was not entitled to any or all benefits paid between the discontinuance and the final decision, the Commissioner may order that the employee repay all

14

benefits to which the employee was not entitled. Id. The Legislature has provided that this order, like an order under § 662(b), is enforceable in court.

¶ 33.  Finally, payments voluntarily made by the employer to an employee during the period of disability that were not, when made, due and payable under the workers' compensation laws may, subject to the Commissioner's approval, be deducted from the amount to be paid as compensation.[2]  21 V.S.A. § 651.  This statute does not purport to require an employee to repay monies paid by an employer outside of the workers' compensation scheme, but does authorize a future credit within the workers' compensation framework.

¶ 34.  A second type of statute recognizes that both the employer and its insurer are directly liable to injured workers, but acknowledges that payments by one of the two under the workers' compensation statute are essentially credited to both.  Id. § 693 (providing that any compensation paid by the employer or the insurer is "a bar to the recovery against the other of the amount so paid.").

¶ 35.  Finally, the only provision in the workers' compensation statute that relates to reimbursement of the employer, or workers' compensation carrier, from proceeds received by an injured worker outside of the workers' compensation process is 21 V.S.A. § 624.  That statute makes it clear that the exclusivity of the workers' compensation remedy does not prevent an injured worker from enforcing the liability of a third party for the worker's injuries; establishes a mechanism whereby the employer may, in the name of the injured employee, pursue a claim

---

[2]  The majority relies on this particular provision of the statute, asserting that it "clearly provides for an offset" under the facts of this case.  Ante, ¶ 17.  The application of this provision is anything but clear.  It is limited to payments that "by the provisions of this chapter, were not due and payable when made."  21 V.S.A. § 651.  There is no dispute that the disability payments that claimant received here were due to her under the CBA, and not pursuant to the workers' compensation statute.  The payments fell outside the plain language of this provision.

The workers' compensation statute does not provide an express provision allowing an offset or reimbursement of sick leave or disability benefits paid during a period of denial.  Even Yustin acknowledged that this is true.  2011 VT 20, ¶ 8.

15

against a third party; and requires an injured employee who receives damages from a third party for the injury that underlies the workers' compensation claim to reimburse the employer from those damages for workers' compensation benefits. Id. That statute is limited to recovery from third parties liable for the injury, including first-party insurers liable for such damages, and prescribes specific limitations and requirements on the reimbursement process.

¶ 36. This review of the workers' compensation statute shows two things, both undermining the majority's conclusion in this case. First and foremost, nowhere in the workers' compensation statute has the Legislature authorized the Commissioner to assess a future credit against workers' compensation benefits on account of, or to order repayment of, disability benefits extended to injured workers by an employer outside of the workers' compensation process and pursuant to contractual requirements, even if the period of those employment benefits overlaps with the period of workers' compensation benefits. See Gintof, 2005 VT 8, ¶ 7 ("If legislative intent is clear, the statute must be enforced according to its terms without resorting to statutory construction. We will not read benefits into the statute that were not provided by the Legislature." (quotation omitted)).

¶ 37. Second, the field of reimbursements and future credits has been well plowed by the Legislature. It has not only identified a half dozen circumstances in which a credit against workers' compensation benefits may be assigned, or in which an injured employee may be ordered to reimburse the employer for benefits extended; it has provided for varying responses in these scenarios—sometimes involving an obligation to repay that is enforceable in court, and sometimes involving a future credit. In the context of payments received by the injured worker outside of the workers' compensation process, it has established parameters for determining how much is due under what circumstances. The only circumstance in which the Legislature has provided that another payer besides the employer has a responsibility to reimburse the employer or employer's carrier for compensation paid for a work-related injury is where there is a third-party tortfeasor.

16

Given that the Legislature has dealt extensively with such issues and has authorized the Commissioner to order reimbursement or to assess credits against future benefits in many circumstances, the fact that it has not authorized the Commissioner to impose an offset like that sought by employer here, or to order an injured employee to reimburse contractual benefits paid outside of the workers' compensation process, suggests an intent that, at least in the absence of any contractual provision authorizing an offset, the Commissioner not be so empowered. See, e.g., Grenafege v. Dep't of Emp't Sec., 134 Vt. 288, 290, 357 A.2d 118, 120 (1976) ("[A] general review of the statute leads us to the conclusion that, simply put, where the Legislature meant 'wages' to mean those earned in subject employment it said so, and that where it did not say so it intended no such restriction.").

¶ 38.    Persuasive decisions from other authorities further support the view that an aversion to "double-recovery" in workers' compensation cases is not enough to vest the Commissioner with broad implied authority to adjust the statutorily mandated workers' compensation benefits wherever necessary to avoid a double recovery.

¶ 39.    In a factually similar case, the Colorado Supreme Court concluded that the employer was not entitled to offset workers' compensation benefits for amounts paid under an employment plan. In Halliburton Services v. Miller, 720 P.2d 571, 573 (Colo. 1986) (en banc), the claimant suffered an injury and received disability benefits under the employer's "Sickness Benefit Plan." The Colorado division of labor later ruled that the claimant was entitled to workers' compensation benefits for the disability, and denied the employer's request to offset that amount by the benefits paid to the claimant under the company's Sickness Benefit Plan. On appeal, the Colorado Supreme Court affirmed, holding that no offset was authorized because it was not provided for in the statutory scheme. Id. at 579. The court emphasized that the benefits the claimant received were mutually exclusive: the benefits paid under the company plan were for disabilities arising from nonworkplace injuries whereas the workers' compensation benefits were

for a workplace injury.  Id.  The court acknowledged that the employer "had a legitimate concern" that the employee had received payments under the sickness benefit plan to which he was not entitled, but explained the proper remedy was to seek repayment from the claimant, not through an offset.  As the court explained:

> Nothing in the statute authorizes the commission to order reductions in a worker's compensation award on the basis of benefits paid to a claimant under a separate and expressly unrelated plan simply because the commission's determination of entitlement to worker's compensation benefits incidentally proves that the claimant was not entitled to those separate payments.

Id.

¶ 40.    Other courts have similarly held that in the absence of express statutory authorization, or a contractual agreement, an employer's liability to pay workers' compensation benefits may not be offset by other employment-related disability benefits received by the employee.  See, e.g., Sw. Bell Tel. Co. v. Siegler, 398 S.W.2d 531, 533 (Ark. 1966) (reversing offset of workers' compensation award against disability payments made because disability payments were distinct benefits not made as advance payments of workers' compensation benefits under contract and applicable statute); Simpson v. Frontier Cmty. Credit Union, 810 S.W.2d 147, 153 (Tenn. 1991) (reversing set-off against workers' compensation benefits for disability benefits paid by employer where neither statute nor parties' contract provided for set-off); cf. Hughes v. Gen. Motors Guide Lamp Div., 469 So. 2d 369, 377-78 (La. Ct. App. 1985) (explaining that employer entitled to credit for sums paid to claimant from employer's disability advance fund that was designed to provide payment for employees until claim is deemed to be compensable workers' compensation claim, where employee signed agreement by which she agreed to repay advances from fund in event her claim was found to be compensable).

¶ 41.    These holdings are consistent with guidance from the most authoritative treatise on the subject.  See A. Larson & L. Larson, Workers' Compensation Law (Matthew Bender Rev. Ed.).  The critical factor identified by Larson in analyzing the analogous question of whether wage

18

payments to an injured employee during the period of disability may offset the workers' compensation benefits due from an employer for that period is whether the payment of wages was intended to be in lieu of the workers' compensation benefits. 7 id. § 82.01. For this reason an "employer can claim no credit if it denied its worker's compensation liability while paying the wages." Id. § 82.03.[3]

¶ 42. The above authorities are persuasive. Pursuant to her employment contract, and wholly outside of the workers' compensation process, claimant in this case received disability payments from employer for a nonoccupational injury. She then received workers' compensation benefits for the same period for an occupational injury. No statute authorizes a reduction of the workers' compensation benefits due to claimant, or confers authority on the Commissioner to reduce claimant's workers' compensation benefits on account of payments that were made wholly outside of the workers' compensation process. Whatever right the employer may have to seek recoupment of the nonoccupational disability benefits it paid is wholly separate from claimant's statutory entitlement to the workers' compensation award under the workers' compensation statute.

¶ 43. For these reasons, the majority cannot properly conclude that the Commissioner's determination that she is not authorized to assess the credit requested by employer is clearly in error. The Commissioner's authority is bounded by the limits set by the Legislature, and cannot

---

[3] At least one of the cases relied upon by the majority is entirely consistent with this view. The issue in Herrera v. Workmen's Compensation Appeals Baord, 455 P.2d 425, 428 (Cal. 1969) was whether the employer was entitled to credit on account of voluntary payments it had made to the injured worker, not payments due on account of a contractual obligation. Vermont's workers' compensation statute expressly authorizes such a credit. See 21 V.S.A. § 651 (stating that payments voluntarily made by employer to employee during period of disability that were not due and payable when made, may, subject to Commissioner's approval, be deducted from amount to be paid as compensation). Two other decisions support the majority's position, although the opinion on which the majority primarily relies emphasized the significance of the employer's self-insured status as to workers' compensation benefits and wage continuation benefits, and the fact that both payments came from the employer's corporate account rather than a third party insurer. Freel v. Foster Forbes Glass Co., 449 N.E.2d 1148, 1150-51 (Ind. Ct. App. 1983). The majority suggests that this distinction is of no moment here. See ante, ¶ 16 n.1.

19

be expanded even for reasons of fairness or equity. See Gintof, 2005 VT 8, ¶ 8 (explaining that Commissioner does not have ability to expand benefits beyond those provided for in statute).

## II. Expansion of Commissioner's Responsibility

¶ 44. Without express acknowledgment of this fact, the majority's approach dramatically expands the Commissioner's adjudicative responsibility to include contractual and equitable claims outside of the workers' compensation system, and beyond the authority delegated to the Commissioner by the Legislature.

¶ 45. The premise of the entire majority opinion is that in the absence of a credit against claimant's future workers' compensation benefits claimant will enjoy a double recovery. Because of this presumed double recovery, the majority invokes policy considerations to require a credit in employer's favor that is not described in the workers' compensation statutes.

¶ 46. But the assumption that claimant has realized a double recovery in this case reflects a legal conclusion that employer has no contractual or equitable right to recover the nonoccupational disability benefits it paid to claimant. The majority has apparently concluded that in this case it does not. But that is both a factual and a legal determination that requires consideration of the claimant's contract with her employer, an analysis of the applicable equitable principles, and possibly review of facts surrounding the employment relationship—all matters well outside of the historical scope of adjudicating a workers' compensation claim.

¶ 47. The new rule of law established by the majority will require the Commissioner, in any case in which the employer or a third party contracted by the employer makes payments to an injured worker outside of the workers' compensation laws, to evaluate the merits of any contractual and equitable claims the employer or a third-party insurer contracted by the employer has to recover payments it has made in the event the injured worker recovers weekly workers' compensation temporary total disability benefits covering the same period. If the employer or

third-party insurer has a right to recoup its payments, then the worker will not realize a double recovery and the employer will not be entitled to a credit.[4]

¶ 48. The Department of Labor is not a general jurisdiction court. The Legislature created the Department to administer various specified laws relating to labor and employment, including the workers' compensation laws. 21 V.S.A. § 1. To that end, the Commissioner oversees the implementation of Vermont's workers' compensation laws, including the compliance of insurers and self-insured employers, provides informal guidance concerning the requirements of those laws, issues interim orders, and conducts formal hearings in contested cases. 21 V.S.A. §§ 601-711. The Commissioner's authority does not extend to adjudicating statutory or common law claims between employer and worker beyond those expressly assigned by the Legislature to the Commissioner. See Vt. Ass'n of Realtors, Inc. v. State, 156 Vt. 525, 530, 593 A.2d 462, 465 (1991) (explaining that agency's authority extends to those matters with nexus to area designated in agency's enabling act).

¶ 49. Nor is the Commissioner equipped to undertake the new legal analysis assigned by the majority. In this case, the majority apparently concludes that the fact that claimant will realize a double recovery is self-evident. The merits of any contractual or equitable claim by the employer to recover the monies in question have not been briefed or argued, and are not actually before this Court. Even if I agreed that this Court could in this case fairly evaluate the legal and factual questions the majority has implicitly decided, I do not believe that at the level of informal adjudication and case processing, the Department is equipped to do so—in this case, or in the far

_____

[4] I assume the majority intends such a case-by-case review, and is not suggesting that the employer's or third-party insurer's right to recoup payments made to the injured worker outside of the workers' compensation process is a nullity. If that's not the case, and the majority is suggesting that the employer is entitled to a credit against workers' compensation benefits in every case, without regard to the claimant's legal obligation to repay a third-party insurer or an employer the benefits that have given rise to the perceived double recovery, then the ramifications of the majority's decision in upending contractual arrangements between third-party insurers, employers, and employees are even more expansive and disruptive than this dissent describes. See infra, ¶ 52.

more complex cases that may arise. Much of the day-to-day work of overseeing the implementation of the workers' compensation process is undertaken by nonlawyer specialists in the Department. Although diligent and conscientious, they are not trained to evaluate contractual and equitable claims between employer and employee, or third-party disability insurer and employee. They are trained to apply Vermont's workers' compensation laws. The majority's decision will force the Commissioner and her designees to adjudicate claims and disputes beyond her statutory authority and institutional capabilities.

III. Interference with Contracts and Complexity of Calculations

¶ 50. Although driven by considerations of public policy, the majority's decision undermines sound policy in at least two respects: it gives the Commissioner the authority to override the terms of contracts negotiated and agreed to by the parties outside of the workers' compensation process, and it brings unreasonable complexity to the calculation of workers' compensation benefits.

¶ 51. Workers' compensation benefits are a statutory entitlement. In contrast, employment-based disability benefits are not. Employment-based disability wage replacement benefit schemes take many forms, including the continuation of regular wages, distinct frameworks providing different levels of wage-replacement benefits for occupational and nonoccupational injuries, and supplemental wage-replacement benefits that operate in addition to workers' compensation benefits. Employers and employees are free to negotiate concerning the coordination of statutorily required workers' compensation benefits with other contractual employment benefits. Except with respect to third-party tortfeasors, the workers' compensation statute is silent as to whether workers' compensation benefits are primary or secondary, or are additive or alternative to other benefits.

¶ 52. The approach employer advocates in this case would effectively override the parties' own agreements on these points. Employees who gave valuable consideration in exchange

22

for disability coverage could find the benefit effectively cancelled out by administrative fiat in the workers' compensation system, even if their bargained-for package of benefits never contemplated such action. In most cases, employers are likely to negotiate to limit an employee's benefits in a situation like this, either by requiring reimbursement of the nonoccupational disability benefits paid by the employer—an agreement wholly outside of the purview of the Commissioner, or by expressly agreeing that particular disability benefits are paid as advances toward workers' compensation benefits and are to be credited against the benefits ultimately determined to be due. But where the parties' own employment agreement does not contemplate an offset of statutory workers' compensation benefits, an order imposing an offset upsets the negotiated agreement of the parties. See Roy's Orthopedic, Inc. v. Lavigne, 145 Vt. 324, 326, 487 A.2d 173, 175 (1985) (explaining that courts must enforce contracts as written).

¶ 53. The majority compounds the danger by indicating that its holding applies even if the workers' compensation benefits or the employer-sponsored disability benefits are funded through third-party insurers. Ante, ¶ 16 n.1. By treating all nonoccupational disability benefits sponsored by the employer, and the workers' compensation benefits paid on behalf of the employer as interchangeable, the majority increases the risk that contractual agreements between third-party insurers and employers will be upended. Third-party workers' compensation carriers may be relieved of paying for benefits the employer contracted with them to pay on account of payments paid by the employers outside of the workers' compensation process, and third-party disability insurers may be stuck paying benefits for what turn out to be occupational injuries, even though their contracts, and the actuarial assumptions on which they are based, do not contemplate such payments. The majority's approach potentially makes workers' compensation secondary to other employer-provided benefits—a policy determination that is best left to the Legislature.

¶ 54. Moreover, given the wide variety of disability wage-replacement schemes that exist in the marketplace, a ruling authorizing the Commissioner to offset the workers' compensation

benefits due to claimant would introduce entirely new layers of complexity to the project of calculating disability benefits. Temporary total and temporary partial disability benefits are not subject to state or federal income tax. Some disability benefits are taxable, and some are not, depending on who paid the premiums for those benefits. Internal Rev. Serv., Pub. 525, https://www.irs.gov/publications/p525/ar02.html#en_US_2015_publink1000229310, [https://perma.cc/5GC6-GZGX]. Disability benefits and workers' compensation benefits may be calculated as different percentages of an employee's pre-injury wages, subject to different minimum and maximum payments. And the two sets of benefits may be subject to different deductions, exclusions and limitations. This circumstance is completely different from the situations addressed in the workers' compensation statute as noted above in which workers' compensation benefits were paid and ultimately determined to be not due. In short, workers' compensation benefits and disability benefits are generally apples and oranges, rendering the notion of an "offset" problematic at best.

¶ 55. This is a case in point. Although the primary issue before the Commissioner was whether to impose an offset, the parties had widely divergent views of how the offset should be calculated. In contrast to the days for which employer paid claimant her full salary as accrued sick days—transactions the Commissioner required employer to essentially unwind by crediting back claimant's sick leave and adjusting the tax withholding, employer does not seek here to unwind the disability payments but, rather, seeks to apply them as credits against workers' compensation temporary and permanent disability benefits. The employer emphasizes the amounts it paid pursuant to the nonoccupational disability provision in the CBA—nearly $25,000. But after taxes and other deductions, claimant received less than $15,000. Given these complexities, determining

24

the appropriate credit, and tax treatment, in a wide variety of different circumstances involving a range of disability programs, even if the Commissioner had authority to do so, would be onerous[5].

## IV. Yustin v. Department of Public Safety

¶ 56. For the above reasons, we should not extend this Court's limited holding in Yustin v. Department of Public Safety, 2011 VT 20, to the unlimited range of circumstances contemplated in the majority opinion.

¶ 57. In Yustin, the State of Vermont initially denied a workers' compensation claim filed by state employee Yustin. Yustin drew employer-funded sick leave while challenging the denial of workers' compensation benefits. The Department of Labor issued an interim order, concluding the injury was work-related and that claimant was entitled to past-due workers' compensation temporary disability benefits. A State of Vermont personnel policy allowed an employee to use sick or annual leave during a "period of injury" and stated that "[a]ny sick or annual leave used for this injury will be reimbursed to the employee if the claim is approved for Workers' Compensation indemnity." Id. ¶ 3. Pursuant to the policy, the state applied the past due workers' compensation payments to the employee's sick leave account and reinstated the sick leave days the employee had used while prosecuting the workers' compensation claim, essentially holding the claimant harmless "from any loss to his accumulated sick leave by the employer's reimbursement to that account as called for in the personnel policy." Id. ¶ 9. The employee challenged this procedure, arguing that the past due temporary total disability benefits should have been paid directly to him, and that the state unlawfully assigned his workers' compensation benefits by appropriating them to itself to reimburse his sick leave account. This Court affirmed,

---

[5] Moreover, an approach that contemplates leaving the nonoccupational disability benefits in place but drawing down claimant's workers' compensation benefits to account for those other payments, leads to a windfall for the state and federal government tax coffers. Contracting to unwind the nonoccupational disability benefits where the underlying injury was ultimately determined to be occupational is a far more sensible way to avoid a double recovery for the claimant.

25

explaining that this decision was consistent with the employer's duties under both its employment contract and the workers' compensation statute. Id. ¶ 10. Therefore, the employer fulfilled its "express statutory obligation by first paying full wage compensation in the form of sick benefits and, after the Department's interim ruling that the claim was compensable, by later paying temporary disability benefits as ordered." Id. ¶ 9. In the course of its discussion, this Court emphasized the strong policy against double recovery of benefits reflected in Vermont's workers' compensation scheme.

¶ 58. The Yustin decision was problematic for many of the same reasons described above. See id. ¶¶ 15-29 (Dooley, J., dissenting). But this Court's general recognition in that closely divided decision of a strong policy against "double recovery" of benefits in the workers' compensation scheme should not be relied on to require the Commissioner to adjust workers' compensation benefits payable to a claimant without regard to any particular statutory authority. The majority's approach in this case goes far beyond the limited holding of Yustin. In Yustin, the Court relied heavily on the fact that the employer had a published personnel policy authorizing the challenged transaction. See id. ¶¶ 4, 9 (noting that Commissioner relied heavily on terms of applicable personnel policy in allowing employer to repay claimant's sick leave account and stating that "[c]laimant was held harmless from any loss to his accumulated sick leave by the employer's reimbursement to that account as called for in the personnel policy" (emphasis added)). The question this Court answered in Yustin is whether honoring the published personnel policy was inconsistent with the Commissioner's statutory obligations. This Court's conclusion that it was not should not be read to support the far broader claim that even in the absence of such a contractual foundation the Commissioner is free to adjust workers' compensation benefits to avoid a perceived double recovery. In contrast to the personnel policy in Yustin regarding repayment of sick and annual leave, the collective bargaining agreement in this case does not provide for any

26

credit to the employer for workers' compensation benefits payable for a period when the employee has received nonoccupational disability benefits.

¶ 59.    A second factor distinguishes Yustin from this case.  In Yustin, the employer was self-insured such that the payments to the claimant for workers' compensation benefits and the payments for sick leave derived from the same source.  The majority suggests that an employer's self-insured status is irrelevant to the analysis, thereby allowing a credit to the employer or a third-party workers' compensation insurer on account of payments made by the employer or a third-party disability insurer without regard to the respective insurers' contractual obligations vis-à-vis the employer or the injured worker.  By delinking its holding in this case from the self-insured status of the employer for workers' compensation purposes, and the fact that the nonoccupational benefits were paid directly by the employer, the majority dramatically expands the reach of Yustin while unmooring its analysis from the foundation on which Yustin rests.

¶ 60.    Absent statutory authority for applying an offset, the Commissioner has no authority to offset statutory workers' compensation benefits to account for transactions between employer and employee that took place outside of the workers' compensation proceedings.  The majority's holding that not only authorizes, but apparently requires, the Commissioner to do so as a matter of law is inconsistent with our ordinary deference to the Commissioner on such matters, expands the Commissioner's responsibilities beyond her statutory authority and expertise, undermines the private contracts, introduces unnecessary complexity into the calculation of workers' compensation benefits, and expands this Court's prior decision on the subject far beyond its rationale and holding.  I would affirm.

¶ 61.    I am authorized to state that Justice Dooley joins this dissent.

_____
Associate Justice

27